In re Dudley M. **MOORHOUS,**
**Jr., Debtor.**

Earl **DORFMAN,** et al., **Plaintiffs,**

v.

Dudley M. **MOORHOUS, Jr.,**
et al., **Defendants.**

Bankruptcy No. 94–10003–AM.
Adv. No. 94–1112.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

April 6, 1995.

Sari Karson Kurland, Washington, DC, Darden Hutson of Hutson & Nuzzo, Arlington, VA, for plaintiffs.

Howard I. Rubin of Gold & Stanley, P.C., Alexandria, VA, for debtor/defendants.

Robert K. Coulter, Asst. U.S. Atty., Civil Office of the U.S. Atty., E.D. VA, Alexandria, VA, for U.S.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

This case presents an issue of first impression as to whether a retired officer of the Air Force may effectively sell a fixed number of future monthly payments of his military retired pay to which he is entitled so that title to those payments is vested in the assignee. The question arises because the debtor entered into a financial transaction structured in just such a manner but subsequently filed bankruptcy. The assignees seek a declaratory judgment that the monthly retired pay being received by the debtor belongs to them, and they have asked this Court to impose a constructive trust on it in the hands of the debtor, to grant injunctive relief requiring the debtor to remit such pay to the assignees, and to award damages for breach of contract and conversion. The United States Air Force was originally made a defendant to this action but was voluntarily dismissed by the plaintiffs.

Trial was held on March 22 and 24, 1995. At the conclusion of the evidence, the Court made findings of fact and conclusions of law orally on the record, and an order was signed on March 24, 1995 entering judgment in favor of the debtors on all counts. In entering judgment, the Court reserved the right to supplement the oral findings of fact and conclusions of law. This memorandum opinion, accordingly, supplements the findings of fact and conclusions of law stated orally upon the record.

### Findings of Fact

The debtor, Colonel Dudley M. Moorhous, Jr., is a 61–year old retired Air Force officer, unemployed at the time of trial. He retired from the Air Force on June 1, 1985 after completing more than 27 years of active service. He is married to the co-defendant, Dorothy ("Dottie") Moorhous. Col. Moorhous resides in Virginia and is entitled to receive monthly retired pay from the Air Force. Following his retirement, Col. Moorhous went to work for a start-up company called Pilot Research Associates. In late 1989, having identified what appeared to him to be a lucrative investment opportunity, he took out a classified advertisement in the "Capital Wanted" classified section of the newspaper USA Today. The advertisement, printed in the edition of November 17, 1989, read as follows:

WILL PAY 17% ANNUALLY!

For $190,000 for 15 years, paying $3,250/mo from government retirement.

This advertisement was read by Mr. and Mrs. Earl Dorfman, who are residents of Pennsylvania. Mr. Dorfman, a 65–year old retired former grocery store owner, contacted Col. Moorhous by telephone, and on November 23, 1989, Col. Moorhous responded with a written proposal to borrow $190,000 for the purpose of purchasing "run-down" residential properties to refurbish and resell. He also assured Mr. Dorfman that, based on the approximately $100,000 a year he was earning with bonuses and the approximately $30,000 per year his wife was earning, he did not need the military retirement to live on. Following a number of letters and phone calls negotiating the tentative terms of the transaction, Joel S. Luber, a Pennsylvania attorney, became involved on behalf of the Dorfmans. Mr. Luber was concerned from the outset over the enforceability of an assignment of Col. Moorhous's retirement pay and wrote to the Air Force Accounting and Finance Activity on March 18, 1990 to determine whether Col. Moorhous could effectively make an irrevocable assignment of his pension. Even before receiving the reply, Mr. Luber evidently had reached a preliminary conclusion that the Air Force might not treat such an assignment as irrevocable, because in a letter of March 20, 1990, he advised Col. Moorhous:

> * * * the structure of this transaction will *not* be a loan. Rather, we intend to structure a private commercial annuity, in which you are, in ·effect, the insurance company, and the Dorfmans are the annuitant * * *.

Col. Moorhous, in a letter of the same date to Mr. Dorfman, specifically acknowledged that the Air Force reply might be to the effect that Col. Moorhous could "interrupt the flow" of pension payments at any time, "since there is no precedent for this procedure of irrevocably giving up in this case 180 payments of retirement pay," but he sought to reassure Mr. Dorfman "the honor code that was instilled * * * at West Point is ever foremost in * * * my mind. My word is still my honor and it will forever be." The Court finds that both Mr. Dorfman and Mr. Luber had concerns over the issue of enforceability and relied on Col. Moorhous's assurances

that his high sense of honor would ensure that the agreement was observed.

At some unspecified time prior to the actual signing of the agreement at issue in this case, Mr. Luber spoke with personnel at the Air Force Finance Center and was advised that the Air Force would only disburse retired pay to the retired member or by direct deposit to an account in the retired member's name. In any event, an agreement was ultimately crafted by Mr. Luber that was signed on April 18, 1990. In a letter to the principals of Housing Renovations, Inc., the company in which Col. Moorhous was investing, Mr. Luber characterized the agreement as follows:

> Very simply, the Agreement provides for a straight up exchange of a single lump sum payment of $125,000 in return for a future stream of income, much is [*sic* ] the nature of a single premium commercial annuity.

The agreement is entitled "Annuity and Assignment Agreement." The recitals state that Col. Moorhous desired to obtain the sum of $125,000 for the purpose of investing in Housing Renovations, Inc., and that the Dorfmans were "prepared to make available" that sum in exchange for an irrevocable assignment of 112½ consecutive monthly payments of his Air Force pension. The agreement then defines "Purchase Price" as the sum of $125,000 and provides,

> In exchange for the purchase price paid by Dorfman, Dudley agrees to pay to Dorfman a 9 year 5 month term certain annuity, paying a monthly benefit in the amount of no less than $3,288.37, with the last payment being one-half of that amount, in the form of an irrevocable assignment to Dorfmans [of] the next 112½ consecutive monthly payments due to him from the Pension.

Several documents signed contemporaneously with the agreement, and intended as part of it, provided for the implementation of the agreement by the creation of an account in Col. Moorhous's name at Jefferson Bank, Philadelphia, Pennsylvania, and the direction—which Col. Moorhous asked to be treated as irrevocable—to the Air Force for direct deposit of his pay to that account. Col. Moorhous gave an irrevocable written

authorization to the bank to withdraw the payment as received each month and to transfer it to an account in the same bank in the name of the Dorfmans. In addition to the direct deposit arrangement, Col. Moorhous and his wife granted, as additional security for the obligation to make the required payments, a first mortgage on two lots in St. John's County, Florida; a third deed of trust on their home in Springfield, Virginia; a collateral assignment of a $250,000 life insurance policy on Col. Moorhous's life; and a pledge of Col. Moorhous's shares in HRI. The agreement provided that upon the occurrence of various specified events of default—including the failure to make the required payments—there would be immediately due and owing a sum equal to the then-monthly payment for the remaining term of the annuity, reduced to present value at the rate of 5%. The agreement also contained a "prepayment" provision allowing Col. Moorhous, after 72 payments, to terminate the agreement by making a lump sum payment equal to the then-unrecovered principal based on a calculation that recovered the original purchase price evenly over the life of the annuity. In the agreement, which stated that it was governed by Pennsylvania law, Col. Moorhous warranted that the transaction was a purely voluntary one on his part and would not cause a financial hardship. He further undertook not to engage in any activity, including civilian employment by the Federal government, which would result in a reduction or forfeiture of his retirement pay.

Col. Moorhous received a check for $119,270.50, representing the $125,000 less recording costs for the mortgage and deed of trust and $5,000 which Col. and Mrs. Moorhous agreed would be paid to Mr. Luber's firm as legal fees.

On April 24, 1990, the Air Force Accounting and Finance Center finally replied to Mr. Luber's inquiry. With respect to the question of an irrevocable assignment of retired pay, the reply stated:

> Retired pay is not a vested pension. It is a statutory right governed by law enacted by congressional legislation. Retired pay can be disbursed only to the Air Force retiree. The disbursement of funds after receipt by the retiree is at his discretion. * * * Direct deposits to a financial institution can be made in Colonel Moorhous' name only and must be at his request. * * * Retired pay terminates upon the retiree's death. However, it may be waived in full or partially in lieu of Department of Veterans Affairs (VA) compensation or civil service retirement. It may be reduced partially or in full by dual compensation or pay cap offsets if he should be employed by the Federal Government. An act of Congress may also stop or change retired pay, and the retiree's pay may be garnished for debts owed to the U.S. Government or by court order for various reasons.

Testimony was presented at trial from an assistant general counsel of the Defense Finance Accounting Service corroborating that the Air Force would not in fact treat a direct deposit authorization as irrevocable or recognize a purported irrevocable assignment of pay.

Mr. Luber's final bill for legal fees came to an additional $6,626.10. After some negotiation, this was resolved by a Second Amendment[1] dated September 14, 1990, but not signed until November 14, 1990, in which Col. and Mrs. Moorhous agreed that the next monthly payment could be retained by Mr. Luber in satisfaction of the additional legal fees, and the term of the annuity was increased by one month (to 9 years 6 months).

Col. Moorhous subsequently wrote to Mr. Dorfman seeking to borrow additional funds to invest in an entity known as ILN. After further negotiation, the parties executed a document entitled "Loan and Third Amendment to Annuity and Assignment Agreement" dated November 14, 1990. Under the terms of this document, Mr. Dorfman agreed to loan Col. Moorhous $18,375, to be repaid in the amount of $25,000 at the end of 7 months. If the money was not repaid at that time, then the annuity would be extended from 9 years 6 months to 11 years 3 months and the number of monthly pension pay-

---

1. The first amendment simply added a provision for notice to HRI in the event of default, since HRI had committed to redeeming Col. Moorhous's shares if the pledge were enforced.

ments assigned increased from 113½ to 134½. Col. Moorhous was unable to make the $25,000 payment.

Col. Moorhous again wrote to Mr. Dorfman seeking a further loan, this time to invest in a company called Hrdlicka House. The result was a document entitled, "Loan, Option and Fourth Amendment to Annuity and Assignment Agreement" dated September 27, 1991. In the document, the Dorfmans agreed to loan Col. and Mrs. Moorhous the sum of $25,000 for three months. The repayment amount was $30,000, in default of which (and if the Dorfmans did not exercise an option to purchase Col. Moorhous's shares in Hrdlicka House) then the annuity would be extended from 11 years 3 months to 13 years 9 months and the number of assigned pension payments from 134½ to 164½. Col. Moorhous did not make the $30,000 payment.

There was one final amendment, dated May 13, 1992, to the Annuity and Assignment Agreement, which simply allowed Col. Moorhous to substitute, for the shares of HRI held as collateral, shares in another company called Venture Prime, Inc.

A total of 42 payments were made by the United States Air Force from May 1990 through October 1993 to the account set up at Jefferson Bank and were paid over to the Dorfmans. There was no evidence presented as to the exact dollar amount paid, but based on Col. Moorhous's net monthly pay of $3,285.28 at the time the agreement was signed, the payments would have totaled in excess of $137,981. In October 1993, Col. Moorhous, without the knowledge or consent of the Dorfmans, submitted a new direct deposit form to the Air Force directing that his retirement pay be sent to an account at NationsBank in Virginia. Col. Moorhous testified that when he submitted the change request, which he said he did because he was "at the end of his rope" financially, he was doubtful that the Air Force would honor it because of his letter direction, signed at the time of the original agreement, requesting that the Air Force treat the direct deposit instructions as irrevocable. On November 1, 1993, after he verified that the deposit had been made into the NationsBank account in accordance with his change request, he sent Mr. Dorfman a letter that began, "Don't panic," and which assured Mr. Dorfman that the interruption of the payments was a temporary situation. No further payments were received by the Dorfmans after October 1993.

After failing to obtain assurances from Col. Moorhous that the direct deposit arrangement would be reinstated, the Dorfmans filed suit against the Moorhouses in November 1993 in the United States District Court for the Eastern District of Pennsylvania. Col. Moorhous filed a Chapter 7 petition in this Court on January 3, 1994, and received a discharge on April 22, 1994. A confessed judgment was obtained against Mrs. Moorhous, who then filed her own chapter 7 petition in this Court on October 5, 1994 and received a discharge on January 31, 1995. Col. and Mrs. Moorhous's cases were each "no asset" cases, and there was no distribution to creditors.

A major point of contention in the testimony was whether the Annuity and Assignment Agreement was "the same deal" as originally proposed by Col. Moorhous in his newspaper advertisement and in his initial letter to Mr. Dorfman. Clearly, the amount of funds initially made available to Col. Moorhous was less than he sought, the reason being that $125,000 was the largest amount Mr. Dorfman felt comfortable advancing until he saw how the arrangement would work out in practice. In calculating the number of payments to be made on account of the $125,000 advance, Mr. Luber performed a simple linear proration. In other words, he multiplied the number of payments which Col. Moorhous had proposed (15 years times 12 months per year = 180 payments) times the ratio of $125,000 to $190,000. The result was 112½. The problem with this calculation is that, as the Court takes judicial notice, the number of payments on a term certain ordinary annuity, if the payment amount and interest rate are held constant, does not vary as a linear function of the principal but rather as the natural logarithm of the principal.[2]

---

2. Specifically, the formula, as expressed in the

Texas Instruments, Inc. user manual for the TI

Testimony was presented that the "deal" proposed by Col. Moorhous ($190,000 repayable in 180 monthly installments of $3,250) embodied an annual percentage rate, as that term is used in the Truth in Lending Act,[3] of approximately 19%, while the transaction described in the April 18, 1990 Annuity and Assignment Agreement was equivalent to an annual percentage rate of approximately 30%, a dramatic increase in the cost of funds to Col. Moorhous over the transaction proposed in the USA Today advertisement. As a result of the changes made by the third and fourth amendments, however, the annual percentage rate of the overall transaction was reduced to approximately 22%, which, although high, the Court does not find in any sense excessive or unconscionable. While there was some testimony that commercial loans were available in 1990 at interest rates in the range of 13% to 17%, there was no evidence that the limited collateral that Col. Moorhous had to offer would have been acceptable to any commercial lender, and the very fact that he resorted to the advertisement in USA Today suggests that he was unable to borrow from commercial lenders such as banks on terms more advantageous than proposed in the advertisement.

Mr. Luber testified that the reason he structured the transaction as an annuity and assignment rather than as a loan was to enhance the enforceability of the payment obligation. Col. Moorhous presented evidence that an annuity would offer certain tax advantages to the Dorfmans as opposed to a loan in the early years of the agreement, since the principal of an annuity is recovered uniformly over the term of repayment, whereas in a loan the payments in the early years are largely interest, and hence taxable. Based on Mr. Luber's and Mr. Dorfman's testimony, including the Court's ability to observe their demeanor, the Court finds that the primary motivation for structuring the transaction an annuity was to enhance its enforceability, and that any tax advantage to the Dorfmans was at best a secondary consideration. Furthermore, the structuring of the transaction as a sale of payments due to Col. Moorhous rather than as a loan to him was by no means inconsistent with his objective. He testified that a friend of his, upon retiring as an airline pilot, had been able to take his retirement pension as a lump sum, and he testified that he was looking for a mechanism to accomplish the same thing. The advertisement in USA Today specifically referred to payments of $3,250 per month being made "from government retirement." At his first meeting with Mr. Luber, he supplied, as an example of how the transaction might work, a document—the provenance of which was disputed—entitled "Agreement for Pension Exchange," which embodied essentially the same concept.[4]

■ A major contention of Col. Moorhous is that the Annuity and Assignment Agree-

58/59 real estate/investment Solid State Software module (1977 ed.), p. 15 is as follows:

$$N = \ln[\,(PMT{-}iBAL)/(PMT{-}iPV)\,]/\ln(1 + i)$$

where N is the number of payment periods, PV is the present value, BAL is the balloon payment, and i is the periodic interest as a decimal.

**3.** 15 U.S.C. § 1601 *et seq.* The "annual percentage rate" for a closed end credit plan is defined in 15 U.S.C. § 1606(a)(1)(A) as "that nominal annual percentage rate which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed, calculated according to the actuarial method of allocating payments made on a debt between the amount financed and the amount of the finance charge, pursuant to which a payment is applied first to the accumulated finance charge and the balance is applied to the unpaid amount financed." The Board of Governors of the Federal Reserve System has issued Regulation Z, 12 C.F.R. Part 226, implementing the Truth in Lending Act. The regulation describes the "an-

nual percentage rate" as "a measure of the cost of credit, expressed as a yearly rate," and prescribes its method of computation. 12 C.F.R. § 226.14 and Appendix J. Although the plaintiff presented evidence also of the "effective annual rate" of the transaction, the Court found the witness's attempted explanation of the difference between the "annual percentage rate" and the "effective annual rate" confusing and did not believe from the demeanor of the witness, a certified public accountant, that he himself actually understood the distinction, other than that they were values churned out by a computer program he used. Accordingly, the Court relies on the annual percentage rates as the most accurate indication of the cost of funds to Col. Moorhous.

**4.** The draft agreement recited that Col. Moorhous desired to obtain a certain sum of money (whited-out in the copy given to Mr. Luber) in "exchange" for "his right to the proceeds of his vested pension for 96 consecutive months * * *"

ment was the product of undue influence by Mr. Luber. Specifically, Col. Moorhous asserts that he was unrepresented by independent counsel and believed that Mr. Luber was representing both himself as well as the Dorfmans throughout the transaction. Mr. Luber's first letter to Col. Moorhous, however, specifically stated that he was representing the Dorfmans, and nothing in any of his subsequent correspondence would have led any reasonable person to conclude that he was acting in any capacity other than as attorney for the Dorfmans. Additionally, nothing in Col. Moorhous's letters to Mr. Luber or Mr. Dorfman even remotely suggests that Col. Moorhous regarded Mr. Luber as his attorney. Indeed, Col. Moorhous, in his letters to Mr. Luber, specifically referred to two persons, a Mark Killingham and a Stanley Zimmerman, as his attorneys.[5] While Col. Moorhous presented evidence at trial that neither Killingham nor Zimmerman were ever in a formal sense his attorneys, there was no evidence that Mr. Luber or the Dorfmans were aware that Col. Moorhous was puffing when he referred to Killingham and Zimmerman as his attorneys. Having heard the testimony both of Mr. Luber and Col. Moorhous, and having had an opportunity to observe their demeanor on the witness stand, the Court finds that Col. Moorhous had no reason to believe, and did not in fact believe, that Mr. Luber was acting as his attorney, and the Court does not credit Col. Moorhous's testimony to the contrary. Indeed, the Court explicitly finds that Col. Moorhous's testimony on this point was false.

Col. Moorhous, moreover, was no business neophyte. In addition to having held positions of significant managerial responsibility in the Air Force—including the billet of wing commander normally held by a general—he had earned a master of business administration (M.B.A.) degree and had worked for several years as a manager of a start-up business. Additionally, while Col. Moorhous may not have retained an attorney to represent him personally, it can be fairly inferred from his testimony that he did solicit curb-

stone opinions from attorneys he knew and that any decision not to pay an attorney to represent him was a conscious one on his part and motivated by a desire not to incur the expense of such representation. For the foregoing reasons, the Court finds that Col. Moorhous's signing of the agreement was not the result of any impropriety or undue influence on the part of Mr. Luber.

### Conclusions of Law

*Jurisdiction*

 This Court has jurisdiction of the issues raised by this adversary proceeding under 28 U.S.C. §§ 1334 and 157(a). Although the Court initially had some concern as to whether—as alleged in the complaint and admitted in the answer—the pleaded causes of action actually constitute "core" proceedings within the meaning of 28 U.S.C. § 157(b), the Court concludes that the issues fairly fall within the ambit of 28 U.S.C. § 157(b)(2)(*O*) ("other proceedings affecting * * * the adjustment of the debtor-creditor * * * relationship, except personal injury tort or wrongful death claims."). Even if the Court is in error on this point, however, it is clear that the action is nevertheless "related to" the debtor's case under the Bankruptcy Code, and the Court treats the assertion and admission by the parties of "core" status as consent under 28 U.S.C. § 157(c)(2) to the entry of a final order or judgment by a bankruptcy judge subject to the right of either party to appeal to the United States District Court under 28 U.S.C. § 158(a).

*Nature Of Transaction*

 The debtor contends that, notwithstanding the formal recitations in the Annuity and Assignment Agreement, the Court should look beyond the form of the agreement to its substance and treat the transaction simply as a loan. As a loan, the debtor asserts, the transaction is usurious and unconscionable, and, moreover, is dischargeable is bankruptcy. The Court can find no reason, however, to disregard the form of the

---

**5.** A letter from Col. Moorhous to Mr. Luber dated February 12, 1990, refers to "my lawyer, Mr. Mark Killingham," and a subsequent letter dated March 27, 1990, in response to a draft Mr. Luber had sent him of the Annuity and Assignment Agreement, states, "My counsel, Mr. Stanley Zimmerman is currently reviewing this document in detail."

transaction. While Col. Moorhous may well have initially pursued the transaction as one in which he was borrowing funds from the Dorfmans, it was made clear to him that the Dorfmans would not enter into a transaction structured as a loan. The language of the agreement is clear and unambiguous, and whether or not he was happy with it, Col. Moorhous entered into it with his eyes open and was under no compulsion to sign it. No fundamental injustice results from treating the agreement as what it purports to be.

*Usury*

■ With respect to the issue of usury, 41 Pa.Stat.Ann. § 201 sets a "maximum lawful rate of interest for the loan or use of money" in the amount of $50,000.00 or less at 6 percent per annum, and 41 Pa.Stat.Ann. § 301(b) sets the maximum lawful rate of interest for residential mortgages at 2½ percent above the current index of long term United States Government Bond yields. 41 Pa.Stat.Ann. § 301(f), however, specifies certain transactions exempted from both those interest rate limitations, including

> (i) an obligation to pay a sum of money in an original bona fide principal amount of more than fifty thousand dollars ($50,000);
>
> * * * * * *
>
> (v) business loans the principal amount of which is in excess of ten thousand dollars ($10,000).

Since, even treating the transaction as a loan, the original principal amount was more than $50,000 and was indisputably for a business purpose, the transaction would not violate the Pennsylvania usury statute. See *In re Jungkurth*, 74 B.R. 323 (Bankr.E.D.Pa.1987), in which a 50.3% interest rate on a loan to purchase a lunch wagon was held not to violate the Pennsylvania usury statute (although, based on other circumstances, the Court did find it unconscionable). As noted above, after taking into account the effect of the second, third, and fourth modifications, the cost of funds to Col. Moorhous is 22%, which the Court does not find to be either usurious or, under the circumstances of this case, unconscionable.

*Assignment*

■ The crucial legal issue, then, is whether Col. Moorhous could effectively assign ownership of payments due to him as military retired pay. If ownership of 164½ months of Col. Moorhous's retired pay had effectively vested in the Dorfmans prior to the bankruptcy filing, then the Dorfmans have a right, superior to that of Col. Moorhous, to receive those payments. As a conceptual matter, there is nothing inherent in a bankruptcy discharge that would defeat a valid pre-petition assignment of payments due under a retirement pension. For example, in *Reagan v. Austin Municipal F.C.U. (In re Reagan)*, 741 F.2d 95 (5th Cir.1984), the debtor was a participant in a municipal retirement plan that, while generally prohibiting the assignment of benefits, contained an exception for a specific credit union. The debtor borrowed from the credit union and assigned her pension as collateral. She subsequently filed bankruptcy, and the Court held that although the debtor's personal liability on the loan had been discharged, the assignment survived the bankruptcy and could be enforced against any payments ultimately due to the debtor. See, also, *Connor v. United States (In re Connor)*, 27 F.3d 365 (9th Cir.1994), in which the Court held that a pre-petition Federal tax lien attached to the interest of the debtor, a retired Alaska Supreme Court justice, in his retirement pension, and that, since the debtor's right to receive the payments had vested prior to his bankruptcy, payments made post-petition were not "after acquired property," and the Federal tax lien attached to post-petition as well as pre-petition payments. While *Connor* involved a statutory lien and *Reagan* a collateral assignment, the reasoning in those cases would be equally applicable in the case of an absolute assignment, as embodied in the agreement presently before the Court.

The question, therefore, is whether there is anything in the nature of military retired pay that would avoid the result reached in *Reagan* and *Connor*. As far back as *United States v. Tyler*, 105 U.S. 244, 26 L.Ed. 985 (1881), the Supreme Court held that an officer of the Army who was "retired from active service" was still "in the military service of

the government." The Court looked to various statutes under which retired officers could be assigned certain duties and remained subject to trial by court-martial and reasoned,

> It is impossible to hold that men who are by statute declared to be part of the army, who may wear its uniform, whose names shall be borne upon its register, who may be assigned by their superior officers to specified duties by detail as other officers are, who are subject to the rules and articles of war, and may be tried, not by a jury, as other citizens are, but by a military court-martial, for any breach of those rules, and who may finally be dismissed on such trial from the service in disgrace, are still *not* in the military service.

*Id.* at 246. A century later, in *McCarty v. McCarty,* 453 U.S. 210, 221–22, 101 S.Ct. 2728, 2735–36, 69 L.Ed.2d 589 (1981), the Supreme Court, in the course of ruling that military retired pay could not be divided by a state divorce court as community property, observed that numerous cases had held that military retired pay was in the nature of "reduced compensation for reduced current services" rather than deferred pay for past services. This analysis, however, was not the basis for the Court's ultimate holding[6] and is substantially undercut by the Court's subsequent opinion in *Barker v. Kansas,* 503 U.S. 594, 112 S.Ct. 1619, 118 L.Ed.2d 243 (1992) in which it was held that for tax purposes military retired pay should be considered deferred pay for past services rather than compensation for reduced current services. Based largely on *Tyler,* the Seventh Circuit, in *In re Haynes,* 679 F.2d 718 (7th Cir.1982),

held that in light of obligations imposed on a military retiree as conditions of receipt of pay, military retirement pay is in the nature of reduced compensation for current services and therefore not "property of the estate."[7] In the present case, however, an analysis of whether Col. Moorhous's future retired pay constitutes "property of the estate" does not significantly assist in resolving the issue before the Court, since one of the few points on which the parties agree is that Col. Moorhous's retired pay is *not* property of the estate—the Dorfmans, because they say that Col. Moorhous sold his rights to the payments before filing bankruptcy, and Col. Moorhous, because such pay is reduced compensation for current services and under Section 541(a)(6) of the Bankruptcy Code is excluded from the definition of property of the estate.

The real significance of the *Tyler–McCarty–Haynes* analysis, from Col. Moorhous's point of view, is that if military retired pay represents compensation for current services, then the assignment has no effect post-petition under the Supreme Court's decision in *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), which held that a pre-petition assignment of wages to secure repayment of a loan does not survive bankruptcy. As the Court reasoned in that case,

> When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty * * *. To preserve its free exercise is of the

**6.** "Having said all this, we need not decide today whether Federal law prohibits a State from characterizing retired pay as deferred compensation, since we agree with the appellant's alternative argument that the application of community property law conflicts with the federal military retirement scheme regardless of whether retired pay is defined as current or as deferred compensation." *Id.* at 223, 101 S.Ct. at 2736. This aspect of the ruling was effectively overruled by Congress in 1982 when it enacted the Uniformed Services Former Spouses' Protection Act, PL 97–252, 96 Stat. 730 [See esp. 10 U.S.C. § 1408].

**7.** While the rationale has varied, the reported cases have consistently held that military retired pay is not "property of the estate" in Chapter 7

cases. *Nunnally v. Nunnally (In the Matter of Nunnally),* 506 F.2d 1024 (5th Cir.1975) (Decision under Bankruptcy Act that Navy retirement benefits due after the filing of the petition did not pass to the trustee in bankruptcy); *Armstrong v. United States (In re Greiner),* 49 B.R. 393 (Bankr. D.N.D.1985) (Coast Guard pension benefits not property of the estate); *In re Siverling,* 72 B.R. 78 (Bankr.W.D.Mo.1987) (same result, Army retirement pay); *Stackhouse v. Kotz (In re Kotz),* 146 B.R. 669 (Bankr.E.D.Va.1992) (debtor's interest under divorce decree in former husband's military retirement pay). Military retirement has, however, been held to constitute property of the estate in the chapter 13 context. *In re Robinson,* 39 B.R. 47 (Bankr.E.D.Va.1984).

utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage-earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either. * * * The new opportunity in life and the clear field for future effort, which is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.

292 U.S. at 244, 54 S.Ct. at 699. In light of the decision in *Barker v. Kansas*, however, it is clear that the Supreme Court no longer holds, at least in all contexts, that military retired pay is in the nature of reduced compensation for current services, and it is at least doubtful, that if the Court were called upon to decide the issue today, it would hold that Col. Moorhous's receipt of military retired pay places him in an analogous position to that of the "wage earner" in *Local Loan Co. v. Hunt.*

The only statute squarely speaking to the question of assignability is 37 U.S.C. § 701, which both parties cite as controlling, although, not surprisingly, they disagree in their interpretation of it. The relevant portion of the statute is as follows:

(a) Under regulations prescribed by the Secretary of the military department concerned, a commissioned officer of the Army, Navy, Air Force or Marine Corps may transfer or assign his pay account, when due and payable.

* * * * * *

(c) An enlisted member of the Army, Navy, Air Force, or Marine Corps may not assign his pay, and if he does so, the assignment is void.

While at first blush the statute appears straight-forward, on closer reading it presents two significant points of ambiguity. The first is the introductory clause, "Under regulations prescribed by the Secretary of the military department concerned." The second is the phrase "when due and payable."

With respect to the issue of regulations, the question is simply stated: did Congress intend to require an enabling regulation before an officer could assign his pay? Or was the intention to authorize officers to assign their pay unless the Secretary concerned prescribed regulations limiting such assignments? It is undisputed that the Secretary of the Air Force has never promulgated regulations specifically addressing an "assignment" of pay as such. The current regulations concerning active duty and retired pay are the Department of Defense Financial Management Regulation ("FMR"), which applies uniformly to all the armed forces and which purports to supersede all former regulations of the individual services. Volume 7A, dated December 12, 1994, and entitled "Military Pay Policy and Procedures Active Duty and Reserve Pay," applies to active duty and reserve pay. Volume 7B, dated November 30, 1992, is entitled "Department of Defense Military Retired Pay Manual," and, as its name implies, applies to retired pay. While neither regulation uses the term "assignment" as such, both recognize an "allotment" of pay. Active duty personnel, under Paragraph 60103, Vol. 7A, DOD FMR, may register up to six "discretionary" allotments for various purposes, including the repayment of consumer loans. Paragraph 60104 allows allotments established while on active duty to continue to retired status; but once discontinued by the retiree, they cannot be reestablished. Paragraph 40211, Vol. 7B, DOD FMR, captioned "Allotments Authorized for Repayment of Indebtedness," is the only provision in the Military Retired Pay Manual addressing allotments by retirees for the payment of debts, and subparagraph (a) limits such allotments to:

(1) Repay defaulted notes insured by the Federal Housing Administration or guaranteed by the Department of Veterans Affairs.

(2) Pay delinquent federal income taxes * * *.

(3) Repay any other indebtedness to any department or agency of the United States Government.

In addition, subparagraph (b) provides, "The member may terminate the allotment at any time."

While the Congressional intent, as expressed in the language of 37 U.S.C. § 701(a), is far from a model of clarity, the Court concludes that Congress intended to require an implementing regulation by the Secretary of the service concerned as a precondition to assignments of pay by officers. The plaintiffs argue forcefully that the statute requires each service Secretary to promulgate a regulation allowing officers, at least under some circumstances, to assign their pay. As written, however, the statute—particularly in its use of the permissive "may" and its absolute prohibition on assignments of pay by enlisted personnel—appears more consistent with an intent to defer to individual service Secretaries to determine the extent to which assignments of pay by officers of that service would be permitted than it is with an intent to confer on officers an enforceable statutory right to assign their pay. Since neither the Secretary of the Air Force nor the Secretary of Defense has issued regulations allowing officers to "assign" their pay, and the regulations that have been adopted allow a retired officer to make an *allotment* of pay only to a limited class of creditors which does not include the Dorfmans—and even then, the retired member retains the right to terminate the allotment "at any time"—the Court concludes that the attempted assignment by Col. Moorhous of his military retired pay was not effective to vest ownership of such pay in the Dorfmans.

The Court's conclusion on this point is strengthened by the further language in the statute that an officer's pay accounts may be assigned "when due and payable." This language is susceptible to two interpretations. The first is that no assignment can be effective except as to pay "due and payable" at the time the assignment is made. The plaintiffs urge that such a result would be "absurd" and would effectively make a nullity of the statute. Clearly, even if not absurd, such a limitation would drastically limit the usefulness of assignments, since ordinarily an officer would have no more than one month's worth of pay due and owing at any given time. The other plausible reading of the statute is to construe the phrase "due and payable" as simply prohibiting anticipation of pay before it is due—in other words, an officer could assign his pay in advance of its becoming due, but the right created by the assignment could be enforced only as and when pay actually became due.

There are only two reported cases construing the phrase "when due and payable," and in each opinion the discussion is unfortunately dicta. *United States v. Smith*, 393 F.2d 318 (5th Cir.1968); *Smith v. Commanding Officer*, 555 F.2d 234 (9th Cir.1977). Both cases involved an attempt to enforce an assignment against the Government, and in each case the Court of Appeals dismissed for lack of jurisdiction. The Fifth Circuit, while declining to rule on whether an assignment arising under a property settlement agreement and divorce decree "may be valid against the parties to it," squarely held that the United States could not be bound by an assignment created under state law and flatly stated, "No serviceman may assign his pay in advance of the date it becomes due and payable." 393 F.2d at 321. The Ninth Circuit opinion addressed the somewhat different issue of a claimed attorney's lien in a serviceman's back pay which the attorney had successfully sued to recover, and observed in a footnote, "We would interpret the quoted phrase as referring to the time when obligations, such as salaries, would ordinarily become 'due and payable' in the first instance and not after becoming 'due and payable' as a result of subsequent litigations." 555 F.2d at 235, n. 1.

While the intent of Congress is far from crystal clear, the Court concludes that the most reasonable reading of the language is that Congress intended to permit assignments only of pay that is due and payable at the time the assignment is made. The logical corollary is that while an assignment might *address* pay becoming due in the future, such assignment would be enforceable only as to pay that had become due and could be revoked at any time with respect to pay not yet due. This interpretation is consistent with the Department of Defense regulation

which permits allotments of pay to be canceled at any time.

*Constructive Trust*

Even though the Annuity and Assignment Agreement cannot be enforced against the Air Force, the Dorfmans urge that they are entitled to enforce it against the debtor. They ask this Court to impose a constructive trust in their favor on military retired pay received by the debtor and to enforce that constructive trust by issuing an injunction requiring the debtor to reinstate the direct deposit of his military retired pay into the account at Jefferson Bank. Following the pretrial conference in this adversary proceeding, Judge David H. Adams of this Court, in order to preserve the *status quo* until the Court could rule on the assignment issues, ordered on October 26, 1994 that Col. Moorhous, pending a final ruling on the merits, escrow, into an account controlled by his counsel, the entire amount of his monthly Air Force retired pay beginning November 1, 1994.[8]

■ It is, of course, well-settled that a court may impose a constructive trust upon real or personal property that a party obtains by fraud, misrepresentation, or other improper means, or if the circumstances render it inequitable for the party holding title to retain it. As explained in a prior opinion of this Court,

> Constructive trusts arise, independently of the intention of the parties, by construction of law, being fastened upon the conscience of him who has the legal estate, in order to prevent what would otherwise be a fraud. They occur not only where property has been acquired by fraud or other improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit.

*Prime Construction Corp. v. Riverside Development Joint Venture A–1 (In re Prime Construction Corp.),* 156 B.R. 176 (Bankr. E.D.Va.1993) (Bostetter, C.J.). At the same time, it has also been observed that "[A] constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code" and "should not be impressed cavalierly." *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443 (6th Cir. 1994). See *Bush v. Taylor,* 893 F.2d 962 (8th Cir.1990), where the Court denied imposition of a constructive trust on the debtor's receipt of pension payments which under a state divorce decree he was to remit one-half to his wife. The Court held that the debtor's liability under the decree was a dischargeable debt and that "operation of the Bankruptcy Code does not in a legal sense result in unjust enrichment."

■ In the present case, the Court is unable to conclude that a proper basis has been shown for the imposition of a constructive trust. Since the Annuity and Assignment Agreement was ineffective, in a legal sense, to transfer title to Col. Moorhous's military retired pay, at bottom what remains is a contract to pay the Dorfmans an annuity in the amount of a specified number of monthly payments of military retired pay to which Col. Moorhous is entitled. While the entry into the agreement was accompanied by more than the usual assurances as to its future observance, there is no evidence that the debtor, at the time he entered into the agreement, did not intend to observe it. His subsequent breach of the agreement, while unquestionably deplorable and while clearly working a hardship on the Dorfmans, does not in a legal sense constitute a fraud or differ from any other breach of contract. Contractual liabilities are routinely discharged in bankruptcy, and the fact that this particular contract may have been more solemn than most does not give rise to a constructive trust on the funds from which the debtor promised to perform the contract. Accordingly, the Court declines to impose a constructive trust in favor of the Dorfmans on the payments of military retired pay received by Col. Moorhous, and in its judgment the Court dissolved the *pendente lite* order entered by Judge Adams requiring the escrow of Col. Moorhous's retirement pay. In the absence of a constructive trust, no basis

---

8. Col. Moorhous disobeyed the order by not escrowing the November 1, 1994, payment and was found by this Court in contempt. Subsequent payments were properly escrowed.

exists for an injunction requiring the debtor to turn over the military retired pay received by him to the Dorfmans and to reinstate the direct deposit arrangement into Jefferson Bank in Philadelphia.

*Breach of Contract and Conversion*

As noted, the complaint filed by the plaintiffs also sought damages for Col. and Mrs. Moorhous's breach of the annuity and assignment agreement (Count III) and for conversion of the military retired pay which they did not pay over to the Dorfmans (Count IV). The Court previously entered summary judgment in favor of the defendants on Count III on the basis that any contractual liability of the defendants had been discharged in bankruptcy. With respect to any claim for conversion arising from military retired pay received by Col. Moorhous prior to filing for bankruptcy, such claim is discharged unless properly determined by this Court to be nondischargeable, presumably under Sections 523(a)(4) or (a)(6) of the Bankruptcy Code, which except from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" and "for willful and malicious injury by the debtor to * * * the property of another entity." However, in order for a debt to be excepted from discharge under Sections 523(a)(4) or (a)(6), the creditor must file a timely nondischargeability complaint. 11 U.S.C. § 523(c); Fed. R.Bankr.P. 4007(c).[9] The deadline in the debtor's case for filing such complaints was April 5, 1994, and the plaintiff's complaint was not filed until April 12, 1994. Accordingly, even if the debtor's conduct in spending the military pay he received prepetition constituted conversion, any claim for damages as a result of such conversion was discharged. With respect to the military pay becoming due post-petition, the Court's ruling that the Annuity and Assignment Agreement was ineffective to vest title in the Dorfmans and that any personal liability of the debtor to the Dorfmans under the Agreement was discharged in bankruptcy precludes a finding that the debtor has wrongfully (in a legal as opposed to moral sense) converted such pay.

This is not to say that the Dorfmans are totally without remedy. Under the Annuity and Assignment Agreement, Col. Moorhous had an obligation to pay an annuity to the Dorfmans for 164½ months. His personal liability under that agreement, and that of his wife, have been discharged in bankruptcy. Valid liens, however, pass through bankruptcy unaffected unless avoided. *Johnson v. Home State Bank,* 501 U.S. 78, 81–83, 111 S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991). Notwithstanding the bankruptcy discharge, therefore, the Dorfmans may enforce any security interest they have under the agreement, and nothing in this opinion or the Court's judgment should be construed as impairing their right to do so. To the extent, however, that the collateral proves deficient, any claim against the debtors arising under the agreement has been discharged.

*Conclusion*

For the foregoing reasons, the Court entered judgment in favor of the defendants on Counts I (declaratory judgment), II (injunctive relief), IV (conversion), and VI (constructive trust) and dissolved the temporary injunction issued by Judge Adams requiring the escrow of the military retired pay. As noted, summary judgment had previously been entered in favor of the defendants on Count III (breach of contract). Count V, which sought specific performance against the Air Force, is moot as a result of the dismissal of the Air Force as a defendant.

---

9. "A complaint to determine the dischargeability of any debt pursuant to § 523(c) of the Code shall be filed not more than 60 days following the first date set for the meeting of creditors * * *."