**In re Sandra Joyce SCOTT, Debtor.**

**Sheila HARMON, Plaintiff,**

**v.**

**Sandra Joyce SCOTT, Defendant.**

**Bankruptcy No. 95–13797–AM.**
**Adversary No. 95–1497.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

June 25, 1996.

Caroline E. Costle, Rosenthal, Rich, Grimaldi & Guggenheim, Alexandria, VA, for plaintiff.

Robert L. Tomlinson, II, Arlington, VA, for debtor-defendant.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

A trial was held on April 17, 1996, on the plaintiff's complaint to determine the dischargeability of a debt for advance wages paid to the debtor, who was employed as a caregiver to the plaintiff's elderly mother.[1] The debtor quit not long after receiving the advance, refused to return the unearned portion, and, when sued in state court for breach of contract, fraud, breach of fiduciary duty, and unjust enrichment, filed a chapter 7 petition the day before trial.[2] The issues before the court are whether the debtor's conduct constitutes fraud, breach of a fiduciary duty, or conversion so as to render the resulting debt nondischargeable and, if so, the amount of the plaintiff's damages. For the reasons stated in this memorandum opinion, the court determines that the debtor's deliberate refusal to return the unearned portion of the advance wages still in her possession when she quit her employment constitutes a willful and malicious injury within the meaning of § 523(a)(6), Bankruptcy Code, and the resulting debt is therefore nondischargeable. This memorandum opinion constitutes the court's findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052.

### Facts and Procedural Background

Sheila Harmon's mother, Helen Frances Frazier, suffers from Parkinson's disease, is paralyzed from the waist down, and is not always fully aware of her surroundings. As a result, she requires around-the-clock nursing care. Mrs. Frazier had come to live with her daughter in 1991. In 1994, she was being cared for in her daughter's home with nursing care being provided by nurses who came to the house. In May 1994, Mrs. Harmon hired the debtor, a certified nursing assistant, to fill in for another nurse who was going on vacation. Shortly thereafter, the debtor was hired full-time and was paid $50 per 8–hour shift.[3] Since the debtor had no automobile or other mode of transportation,

1. The trial was consolidated with the trial of a separate adversary proceeding filed by the plaintiff objecting to the debtor's discharge under § 727, Bankruptcy Code, and with the hearing on the plaintiff's objection to the debtor's claimed exemptions. This memorandum opinion will discuss only the issue of dischargeability. The court's findings of fact and conclusions of law on the objection to discharge and objection to exemptions will be set forth in separate opinions.

2. Aside from an $84 telephone bill, the plaintiff's claim was the only unsecured debt listed on the debtor's schedules.

3. This worked out initially to $400 to $450 per week.

Mrs. Harmon and her husband allowed her to use an automobile—a recent model Camaro—that belonged to Mrs. Harmon's husband. Until the events giving rise to the present controversy, the relationship between Mrs. Harmon and the debtor was intimate and friendly. The debtor's father was dying of a brain tumor at the time, and she and Mrs. Harmon had long talks about death and about religious issues generally. Mrs. Harmon testified that as a result, she came to trust the debtor as much as she trusted anyone she had met. She expressed her affection for the debtor by giving her birthday and Christmas presents and by paying for a wedding dress for the debtor's daughter. She also gave the debtor $3,000 in September 1994 after the debtor's father died to cover her travel to the funeral and related expenses. The debtor reciprocated with greeting cards.

In December 1994, Mrs. Harmon, who has health problems of her own, was briefly hospitalized with pneumonia. At this time, the debtor, with Mrs. Harmon's blessing, moved the mother to her (the debtor's) house. After Mrs. Harmon returned from the hospital, she realized that caring for her mother in her house was no longer practical, but she did not wish to place her mother in a nursing home. Accordingly, the debtor and Mrs. Harmon agreed that Mrs. Frazier would live, and be cared for, in the debtor's home. The debtor would cover two shifts (evening and night) during the week and every other weekend, and another nurse's aide, Sheila Smith, would take the third (daytime) shift during the week and would take care of Mrs. Frazier at her (Mrs. Smith's) house on the alternating weekends. At this point the debtor's pay was increased to $500—$600 per week, plus bonuses.

Additionally, there were discussions as to a further increase, with the debtor pointing out that nursing home care would cost approximately $40,000 per year. The evidence was conflicting as to whether the debtor asked for a six-month advance or whether the idea for the advance originated with Mrs. Harmon.[4] Mrs. Harmon testified that she was concerned over the debtor's personal situation (which included the need to move to a new neighborhood and to acquire an automobile) and recognized that the debtor would have a number of up-front expenses. In any event, Mrs. Harmon determined that $28,000 would be a fair amount of compensation to the debtor for the first six months of care for Mrs. Frazier under the new arrangement. On April 24, 1995, she wrote the debtor a check for $29,800,[5] which was delivered to the debtor at her (the debtor's) house. The debtor then telephoned Mrs. Harmon to determine what the check represented.[6] Mrs.

---

4. The plaintiff introduced into evidence a handwritten note (Plaintiff's Exhibit 1) that she testified the debtor handed to her:

> 4–21–95
> Dear Sheila,
> Being paid six months in advance plus food money for Helen will be a great help to me and my kids, Nicole & Deltric cry their eyes out if she leave.
> "Love you"
> Sandra

The debtor, however, denied at trial having written the note, and the signature does not appear to resemble the debtor's signature on her schedules and statement of affairs (Plaintiff's Exhibits 31 and 32) or, for instance, the purchase agreement for the Hyundai automobile the debtor purchased after receiving the money from Mrs. Harmon (Plaintiff's Exhibit 25). It does resemble, but does not appear to be an exact match for, the handwriting on a Mother's Day card (Plaintiff's Exhibit 33) the debtor sent Mrs. Harmon. The court is at a loss to explain the differences, but fortunately the outcome of this adversary proceeding does not hinge on the authenticity or authorship of Plaintiff's Exhibit 1. Regardless of who first raised the idea of the six-month advance, the debtor's testimony is clear that she understood, in accepting the advance, that it was to cover the period until November 1, 1995.

5. The sum included an extra $1,800 to enable the debtor's husband, Ross Scott, to purchase an automobile. Mr. Scott had recently returned from a drug addiction program and had done some painting work for Mrs. Harmon. Mrs. Harmon's perception was that the marriage was on the verge of crumbling, with the debtor planning to leave. Mrs. Harmon wanted the debtor to be able to make a clean break: hence the money to enable Mr. Scott to purchase the car.

6. Mrs. Harmon testified that she attached a yellow "sticky" note to the front of the check that explained the breakdown. The debtor testified that no note was on the check when she received it. Although the "memo" line on the check contains a breakdown, Mrs. Harmon testified that she added the memo entry after the check was returned by her bank.

Harmon explained that she had calculated the $28,000 on the basis of $10,000 for each of the two shifts the debtor would cover for six months (until November 1, 1995), and a bonus of $400 for each of the two shifts.[7] The debtor agreed to the arrangement. Several days later, Mrs. Harmon gave her a check for an additional $1,000 with the idea that a larger downpayment on the car the debtor was purchasing would result in a lower monthly payment. After receiving the check, the debtor told her that she did not need it for that purpose, and it was agreed that the debtor would use it to purchase groceries for Mrs. Harmon's mother.

The debtor deposited $29,000 of the $29,800 in three bank accounts—an interest checking account, a money market account, and a certificate of deposit—that she opened after receiving the check.[8] Several days later, she deposited the $1,000 "grocery money" check into the interest checking account. No other funds were deposited in those accounts. Mrs. Harmon testified, and the debtor denied, that after the debtor received the $29,800 check, her attitude changed dramatically, and she became abrupt with Mrs. Harmon and seemed to resent Mrs. Harmon coming to visit her mother. Mrs. Harmon's perception was that the debtor was on the verge of a nervous breakdown.

In late May or early June, Mrs. Harmon received a telephone call from the debtor's husband seeking to borrow money. He had telephoned her for that purpose previously, and on one occasion she had given him $100. This time he told her, somewhat elliptically, that despite his treatment for drug addiction, he had been unable to "stay right," that he owed "certain people" a lot of money, that

those people "don't play," that they knew where he lived, and that he didn't want his family or Mrs. Harmon's mother "hurt." Thoroughly alarmed over the possibility that armed drug dealers might turn up at the debtor's house intent on revenge, and nervous for the safety of her mother, Mrs. Harmon discussed the matter with Sheila Smith, who on Friday, June 9, 1994, agreed (since it was her weekend to care for Mrs. Frazier anyway) to move her to Mrs. Smith's house a day early and to keep her there until matters could be resolved.

When the debtor found out about the move, she telephoned Mrs. Harmon from Mrs. Smith's house and told her, "Since your mammy is over at Bunzie's,[9] she can stay here," and, "Since she brought her over here, she can keep her fat ass." Later that same day the debtor called Mrs. Harmon again and left a message on her telephone answering machine, "Just so you'll know, I f* * *ing quit." The next day, however, she telephoned and told Mrs. Harmon that she would do night shifts. Mrs. Harmon asked her if she would give Sheila Scott $5,000 of the money that Mrs. Harmon had given her. This was to compensate Mrs. Scott for the fact that she would now be handling two shifts and the debtor only one. The debtor agreed to do so.[10] The debtor then worked Sunday night but telephoned Mrs. Harmon at 4:00 a.m. on Monday morning (June 12, 1995) and told her, "I am out of here." At this point, approximately $12,735 of the $29,800 remained in the bank accounts.[11]

The debtor moved a few days later from Alexandria to Woodbridge, Virginia.[12] She left *no forwarding address and acquired an*

---

7. This works out to approximately $770 per week, somewhat higher than the $500 to $600 the debtor had been receiving up until that point.

8. All three accounts were at the same bank. $14,000 went into an interest checking account, $10,000 into a money market account, and $5,000 into a certificate of deposit. The day after the accounts were opened, $9,000 was withdrawn from the interest checking account in two $4,500 increments. Of this sum, $3,500 was used as the cash downpayment on a Hyundai Elantra automobile the debtor purchased on April 26, 1995. The disposition of the balance is unexplained.

9. "Bunzie" was Mrs. Smith's nickname.

10. According to Mrs. Smith, however, after the telephone call was over, the debtor told her, "I've got mine" and "the white bitch is not going to get nothing back."

11. $7,035.87 in the interest checking account and $5,000 plus accumulated interest in the certificate of deposit.

12. The lease for the house to which the debtor moved is dated June 11, 1995.

unlisted telephone number. She never gave Mrs. Smith the $5,000 she had agreed to turn over out of the $28,000 in advance pay, but she did give Mrs. Smith $300 of the $1,000 she had received as grocery money. As a result of the debtor's quitting, Mrs. Harmon had to pay substitute nursing aides an additional $18,050 to provide the care needed for her mother. In order to come up with the additional money, Mrs. Harmon took out a second mortgage against her house. She was unable to keep up the payments, and the house, at the time of the hearing, was scheduled to go to foreclosure in three weeks.

Shortly after the debtor quit, Mrs. Harmon retained counsel who demanded the return of the unearned advance pay. When the debtor refused to do so, Mrs. Harmon brought suit against her in the Circuit Court of the City of Alexandria for breach of contract, fraud, breach of fiduciary duty, and unjust enrichment. In addition to an accounting and imposition of a constructive trust, the suit sought compensatory damages of $25,584 and punitive damages of $50,000. The debtor responded by filing a voluntary chapter 7 petition in this court on August 29, 1995, the day prior to the scheduled trial date. By this point, nothing remained of the advance wages that Mrs. Harmon had paid her.

### Conclusions of Law and Discussion

This court has subject-matter jurisdiction of this controversy under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984. Venue is proper in this District under 28 U.S.C. § 1409(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The complaint to determine dischargeability was timely filed,[13] and the court has in personam jurisdiction over the debtor, who was properly served and has appeared generally.

The plaintiff urges that the debtor's actions constitute fraud, a breach of fiduciary duty, and conversion, and that, accordingly, any damages to which the plaintiff is entitled are nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6), Bankruptcy Code. The plaintiff claims a total of $38,890 in compensatory damages[14] and seeks an additional $50,000 in punitive damages. Each of the three asserted grounds of nondischargeability will be examined in turn.

### A. False pretenses, false representation, or actual fraud.

Under § 523(a)(2)(A), Bankruptcy Code, a discharge under chapter 7 does not discharge an individual debtor from a debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In order to sustain a finding a nondischargeability based on false pretenses, a false representation or actual fraud, the creditor's proof must show:

(1) the debtor made misrepresentations;

(2) the debtor knew the representations were false at the time they were made;

---

13. Section 523(a), Bankruptcy Code, specifies 16 types of debts that are nondischargeable in a chapter 7 case. With respect to 12 of these categories, there is no time limit for seeking a determination of nondischargeability. Fed. R.Bankr.P. 4007(b). Since under 28 U.S.C. §§ 1334(b) and 157(a) the jurisdiction of bankruptcy courts over "proceedings ... arising under" the Bankruptcy Code is not exclusive, a nonbankruptcy court, state or Federal, would have jurisdiction to determine whether a particular debt alleged to be excepted from discharged under one of those 12 categories had been discharged. With respect to four of the categories of nondischargeable debts, however—those spec-

ified in § 523(a)(2), (a)(4), (a)(6), and (a)(15), Bankruptcy Code—only the bankruptcy court in which the debtor's case is pending may make a determination of nondischargeability, and the complaint seeking such a determination must be filed within 60 days of the first date set for the meeting of creditors. § 523(c), Bankruptcy Code; Fed.R.Bankr.P. 4007(c).

14. This amount is calculated as $20,840, representing the prorated portion of the $28,000 attributable to the period from June 12, 1995 to November 1, 1995, plus $18,050, the cost of employing substitute nursing aides after the debtor quit.

(3) the representations were made with the intention and purpose of deceiving the creditor;

(4) the creditor justifiably relied on the representations.

(5) the creditor sustained the alleged loss and damages as a result of the representations having been made.

*Zedd v. Sandler (In re Sandler)*, 143 B.R. 67, 70 (Bankr.E.D.Va.1992) (Shelley, J.); *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The burden of proof is on the creditor, and the standard of proof is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 Here, it is urged that the evidence shows that the debtor, at the time she accepted the $29,800, had no intention of caring for Mrs. Harmon's mother for six months. In support of this contention, the plaintiff points to the debtor's dramatic change of attitude after receiving the check (suggesting that the prior appearance of intimacy had been a ploy), the short period of time (barely seven weeks) that elapsed between receipt of the check and leaving, and the vulgarity of the debtor's conduct. It is true that one might draw such a conclusion from the circumstances.

However, the court finds it just as likely that the debtor, when she accepted the $29,800 check on the understanding that the bulk of it was to compensate her caring for Mrs. Frazier until November 1, 1995, intended to do so and changed her mind because of intervening circumstances. Mrs. Harmon's testimony detailed some of the pressures the debtor was under at that time, particularly with respect to her marriage. Mrs. Harmon also testified that the debtor seemed to be close to a nervous breakdown during the period leading up to June 12, 1995. The triggering event for the blow-up was Ross Scott's telephone call implying possible danger from drug dealers. This quite reasonably alarmed Mrs. Harmon and precipitated the move of her mother to Sheila Smith's house. Regardless of whether the move justified the debtor in quitting, the issue is not whether the quitting was justified but whether it was premeditated—that is, part of the debtor's plan at the time she engaged in the negotiations with Mrs. Harmon that culminated in the payment of the six-month advance. Even under a preponderance of the evidence standard, the court does not find that the debtor misrepresented her intentions at the time she accepted the $29,800 check. Accordingly, the court cannot find that the plaintiff has established a case for nondischargeability under § 523(a)(2)(A).

## B. *Defalcation by a fiduciary.*

 Under § 524(a)(4), an additional category of debt that is nondischargeable in the chapter 7 case of an individual is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The plaintiff argues that once the debtor quit, she lost any claim of entitlement to the unearned portion of the advance pay, and that any such funds still in her hands were impressed with a constructive trust. The plaintiff argues that $20,840 of the $28,000 remained unearned when the debtor quit on the morning of June 12, 1995. The record reflects that on that date she still had at least $12,735 of the funds, and the plaintiff argues that the debtor's subsequent spending of those funds constituted a breach of her fiduciary duty to return them to the debtor. "It is, of course, well-settled that a court may impose a constructive trust upon real or personal property that a party obtains by fraud, misrepresentation, or other improper means, or if the circumstances render it inequitable for the party holding title to retain it." *Dorfman v. Moorhous (In re Moorhous)*, 180 B.R. 138, 151 (E.D.Va.1995). At the same time, it has been observed that "[a] constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code" and "should not be impressed cavalierly." *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir.1994). The primary difficulty with the plaintiff's argument, however, is that the term "fiduciary" as used in § 523(a)(4) is restricted to "the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors or public officers and, absent special considerations, does not extend to the more general class of fiducia-

ries such as agents, bailees, brokers, factors, and partners." *Sager v. Lewis (In re: Lewis)*, 94 B.R. 406, 410 (Bankr.E.D.Va.1988) (Shelley, J.); *Matter of Marchiando*, 13 F.3d 1111 (7th Cir.1994), cert. denied *sub nom. Illinois Dept. of the Lottery v. Marchiando*, —— U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994) (constructive, resulting, or implied trusts do not come within reach of § 523(a)(4); hence, lottery ticket seller not "fiduciary" within meaning of § 523(a)(4) so as to make debt from failure to turn over proceeds from ticket sales nondischargeable).

■ In the present case, there is no evidence to support the notion that the $29,800 paid by Mrs. Harmon to the debtor on April 24, 1995 was envisioned as being held in any sort of express trust. It was simply payment in advance for services to be rendered and, moreover, was paid precisely because Mrs. Harmon knew that the debtor had "up front" financial needs that had to be met ahead of the time that the services were to be performed. The transfer was not accompanied by any restriction that the funds be segregated or that they not be spent prior to the time they were earned. While in everyday terms Mrs. Harmon certainly *trusted* the debtor to take care of her mother for the next six months, she did not in a legal sense *entrust* the money to the debtor's care or management. The money was paid to the debtor as wages, and she was free to spend it. Even if her subsequent quitting was an unjustifiable breach of the agreement under which she was paid her wages in advance, such breach did no more than create a right of refund for the unearned portion of the wages. While at that point it was certainly inequitable for the debtor to retain those funds, at least to the extent that she had not already spent them, they did not thereby become trust funds under § 523(a)(4). "Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing' defendant's property or assets with a constructive trust." *In re Omegas Group, Inc., supra,* 16 F.3d at 1451. No such judgment had been obtained prior to the debtor's spending of what remained of the $29,800 at the time she quit. Accordingly, the plaintiff has not established a case for

nondischargeability under § 523(a)(4), Bankruptcy Code.

## C. Willful and malicious injury to property.

■ There remains for consideration the question of whether the debtor's conduct constitutes "a willful and malicious injury by the debtor to another entity or to the property of another entity," since such conduct ·is an independent basis for nondischargeability of the resulting debt. § 523(a)(6), Bankruptcy Code. The Fourth Circuit has recently spoken with respect to what is meant by "willful and malicious":

> We noted in [*St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003 (4th Cir. 1985) ] that "willful" means "deliberate or intentional." Thus, we ascribe to the word "willful," as it pertains to Section 523(a) of the Bankruptcy Code, a meaning similar to that derived from its use in other areas of the law.

> "Malice," however does not mean the same thing in Section 523(a) that it often does in other contexts. A debtor may act with malice even though he bears no subjective ill will toward, and does not specifically intend to injure, his creditor. Hence, a debtor's injurious act done "deliberately and intentionally in knowing disregard of the rights of another," *i.e.,* a creditor, is sufficiently willful and malicious and prevents discharge of the debtor.

> Because the *St. Paul* test requires a deliberate act in "knowing" disregard of a creditor's rights, it is the debtor's subjective state of mind that is relevant; it does not matter that a "reasonable debtor" should have known that his act would adversely affect another's rights. However, a particular debtor's knowledge may be proved by circumstantial evidence: "Implied malice ... may be shown by the acts and conduct of the debtor in the context of [the] surrounding circumstances."

*First Nat'l Bank of Md. v. Stanley (In re Stanley),* 66 F.3d 664, 667–668 (4th Cir.1995) (internal citations omitted). In *Stanley,* the debtor had applied to a bank for a $10,000 line of credit, but the bank had approved

only an $8,000 credit line, which the debtor immediately drew down. Three months later, as a result of a bookkeeping error, the bank mailed the debtor a statement reflecting an $80,000.00 credit line. The debtor then drew down the "extra" $72,000 to purchase some real estate which he expected to appreciate in value. The market, however, plummeted, the property was sold at a loss, and the debtor filed a bankruptcy petition. The Fourth Circuit upheld the District Court's determination that the debt was nondischargeable and ruled that the debtor's subjective intention to repay the debt was irrelevant and that what mattered was that the debtor had knowingly exercised dominion and control over funds that he knew belonged to another. Such conduct, the court held, constituted a "willful and malicious" injury to the bank's property within the meaning of § 523(a)(6) and required that the debt be excepted from discharge.

■ Here, the plaintiff argues that "once Ms. Scott quit, the unearned portion of her advance reverted to Ms. Harmon's property, particularly the funds that were unspent as of the time she first announced that she was quitting." Plaintiff's pretrial memorandum, p. 16. Under settled principles, conversion—defined as "an act of dominion or control wrongfully asserted over another's property inconsistent with his ownership of it"—can constitute a willful and malicious injury to property within the meaning of § 523(a)(6),

Bankruptcy Code. *Richmond Metropolitan Hospital v. Hazelwood (In re Hazelwood)*, 43 B.R. 208, 213 (Bankr.E.D.Va.1984).

■ From what has been discussed above, it is clear that the mere failure to refund the unearned portion [15] of the advance does not constitute a conversion of those funds. The $29,800 was not paid to the debtor on any understanding whatsoever that they were to be segregated or not be spent until they were earned. Indeed, Mrs. Harmon specifically anticipated that the debtor would need to spend the funds prior to the time they were earned—that was the whole point of the advance. When the debtor quit prior to completing the work she agreed to perform, she unquestionably became liable to Mrs. Harmon for the unearned portion of the wages. At least as to that portion that had already been spent, however, the unearned wages did not thereby become the "property" of Mrs. Harmon so as to be the subject of a "conversion" when they were not paid back. They were a debt, pure and simple.

With respect to the *unspent* portion, however, the conclusion is different. Although the debtor was not, until she quit, subject to any legal restriction that would have prevented her from fully expending the advance wages, nevertheless a substantial portion of those wages were still in her possession, intact and safely deposited in a bank account and certificate of deposit, on the day she quit.

---

**15.** The actual amount of the wage advance (which included anticipated bonuses) was $28,000, since the $1,800 was intended to assist the debtor's husband in purchasing a car. On the assumption that the debtor had already been fully paid up to April 24, 1995, when she received the $28,000 advance, she worked 52 of the 191 days covered by the advance. As a result, approximately $7,623 of the advance had been earned and $20,377 remained unearned when the debtor quit. There is insufficient evidence to determine what portion of the $1,000 "grocery money" had been expended for its intended purpose. The debtor kept no records, and her testimony that all but $300 that she subsequently turned over to Mrs. Smith had been used to purchase food and other items for Mrs. Frazier was not credible. Clearly, however, some amount was spent. Giving the debtor the benefit of every doubt, the court finds that as much as $75 a week could reasonably have been spent during the approximately 6 weeks that the debtor took care of Mrs. Frazier in the debtor's

home after receiving the $1,000. Accordingly, the court finds that $450 of that amount, at the most, had been spent for its intended purpose. The debtor paid $300 to Mrs. Smith. That leaves $250 unaccounted for. Accordingly, were the court simply determining—without regard to dischargeability—the amount of the unearned advance wages and unspent grocery money owed to Mrs. Harmon, the court would fix such amount at $20,627 ($20,377 plus $250). The court does not find that Mrs. Harmon would be entitled, in addition, to recover the $18,050 she expended for substitute nursing care after the debtor quit. Under settled principles, she would be entitled to any additional expense she incurred as a result of the debtor's breach of contract, but not to *both* a return of unearned monies paid *and* her cost to cover. Here, the cost for substitute care was *less* than the unearned wages, and an award of damages for the unearned wages would fully compensate her for the debtor's breach.

As to the unearned advance wages still in her possession, there can be little question that Mrs. Harmon's claim to them was superior to that of the debtor. Instead of returning the unspent funds to Mrs. Harmon, however, the debtor closed out the bank account and certificate of deposit that held the funds and spent them. It fairly appears from the evidence that she was fully aware that Mrs. Harmon was demanding the return of the funds and that the debtor deliberately attempted to defeat Mrs. Harmon's rights by spending what remained of the funds and attempting to conceal her own whereabouts from Mrs. Harmon. While the debtor's remark to Mrs. Smith—referring to Mrs. Harmon as a "bitch"—could fairly be construed as evidence of subjective ill will, it is not necessary to make such a determination in order to find that the debtor's actions constituted a willful and malicious injury within the meaning of § 523(a)(6). It is sufficient, as the Fourth Circuit has stated, that the debtor's actions were done deliberately and intentionally in knowing disregard of Mrs. Harmon's rights. *Stanley, supra.*

At the time the debtor quit, she still had $12,735 of the advance wages and food money that Mrs. Harmon had paid her. She subsequently paid $300 of the food money to Mrs. Smith, leaving $12,435 that should have been returned to Mrs. Harmon but was wrongfully appropriated by the debtor to her own use. Although the court recognizes that Mrs. Harmon has, as a result of the debtor's actions, suffered injury that goes considerably beyond mere financial loss, the court cannot find that the debtor's actions were specifically undertaken to harm Mrs. Harmon or that the impending foreclosure of Mrs. Harmon's home was a foreseeable consequence of the debtor's actions. Additional-

ly, the debtor's income and standard of living hardly exceeds the subsistence level,[16] and it is highly doubtful that she has the ability to pay even compensatory damages. Having carefully considered the matter, therefore, the court does not find an award of punitive damages [17] to be appropriate under the facts of this case. Accordingly, the court determines that Mrs. Harmon's claim against the debtor in the amount of $12,435 is nondischargeable under § 523(a)(6), Bankruptcy Code, and the court will enter judgment in favor of Mrs. Harmon against the debtor for that amount together with interest from June 12, 1995.[18]

A separate judgment will be entered consistent with this opinion.

---

**16.** The debtor is currently employed as a home child care provider and raising two teenage children on her own. She has only a high school education.

**17.** "Punitive, or exemplary, damages, are damages imposed on a wrongdoer 'for the protection of the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses.'" *Diaz Vicente v. Obenauer,* 736 F.Supp. 679, 695 (E.D.Va.1990), quoting *Baker v. Marcus,* 201 Va. 905, 114 S.E.2d 617 (1960). A bankruptcy court

has jurisdiction, in the context of a complaint to determine the dischargeability of a debt, to determine that the plaintiff is entitled to punitive damages. *Lisk v. Criswell (In re Criswell),* 44 B.R. 95 (E.D.Va.1984).

**18.** *Harris v. U.S. Fire Ins. Co.,* 162 B.R. 466 (E.D.Va.1994) (bankruptcy court has jurisdiction in nondischargeability action to enter money judgment as to amount excepted from discharge).